## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**CAROL FLORES-COLLADO**,
    Petitioner,

v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 20-1389 (BJM)

### <u>OPINION AND ORDER</u>

Carol M. Flores-Collado ("Flores") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that she is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Flores argues that the administrative law judge ("the ALJ") incorrectly decided that Flores's major depressive disorder did not reach the level of a severe impairment. Docket No. ("Dkt.") 27. Flores also contends that the ALJ wrongly concluded that Flores's impairments did not meet the level of a "listed" impairment that would by default preclude her from performing substantially gainful activity. *Id*. Flores challenges the ALJ's determination regarding her residual functional capacity ("RFC") as well. *Id*. The Commissioner opposed. Dkt. 31. This case is before me by consent of the parties. Dkts. 16-18. For the reasons set forth below, the Commissioner's decision is **REVERSED** and **REMANDED**.

### APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's

*Flores-Collado v. Commissioner of Social Security*, Civil No. 20-1389 (BJM)                    2

findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the

claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in Appendix 1 of the regulations, impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, at which point the ALJ assesses the claimant's RFC and determines whether the claimant's impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability

existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings at Dkt. 26.[1]

Flores was born on June 10, 1984 and is a resident of Mayaguez, Puerto Rico. Dkt. 26 ("Tr.") at 44. At the time of the hearing before the ALJ she lived with her husband and four daughters. Tr. 45. Flores last worked as a marketing promoter and stepped away from the role in 2013 after working full-time for four years, allegedly due to pain in her back and numbness in her hands. Tr. 52, 203. She had previously worked at auto stores as a sales executive and had taken on a variety of other jobs and positions as well. Tr. 48-52. She had an associates degree meant to support a position as a pharmacy technician. Tr. 46. At the hearing before the ALJ, Flores stated that she cannot read, write, or speak in English. *Id*. However, on another occasion she allegedly said that she can read and write in English, although her understanding is limited and she can speak just a little. Tr. 768.

On June 30, 2014, Flores spoke with Dr. Roberto Gutierrez Morales ("Dr. Gutierrez"). Tr. 301. Her chief complaints were sadness and anxiety, though she apparently also had symptoms including crying, insomnia, poor appetite, irritability, anhedonia, and low self-esteem, which had all onset six years ago after family problems arose. Tr. 299. She also had hypertension, gastritis, and allergic rhinitis, but no known drug allergies. *Id*. She was noted to be calm, cooperative, and friendly. Tr. 300. Her gross and fine motor skills were adequate and normal. *Id*. However, her mood was anxious, depressed, and irritable and her affect was restricted. Id. Flores's thought processes

---

[1] A full recounting of the medical record would be unnecessarily exhaustive and exhausting here; I have only included material that is cited by the parties or otherwise relevant to Flores's claims.

were deemed to be logical, relevant, and coherent. *Id*. She had no hallucinations or delusions. *Id*. Her cognitive functions were fully intact. Tr. 301. Flores was diagnosed with recurrent and moderate depressive disorder and another unspecified morbidity, referred to a psychologist, referred for psychotherapy, and prescribed Prozac and Vistaril. *Id*.

On July 28, 2014, Flores spoke with Dr. Gutierrez again. The findings and diagnoses were essentially the same except that Flores was no longer noted to be irritable and her concentration was somewhat diminished; she noted being depressed and anxious because of the death of her grandmother. Tr. 295-96. On August 29, 2014, Flores spoke with Dr. Gutierrez again. Her condition had supposedly not improved, and she reported sadness and frequent crying, although her concentration was no longer diminished; her affect was noted to be anxious, depressive, and labile, and she was no longer noted to be friendly. Tr. 291-92.

On September 30, 2014, Flores saw Dr. Cristina Santiago Ramirez ("Dr. Santiago"). The findings and diagnoses were largely the same as her last appointment with Dr. Gutierrez, except that she was noted to have appropriate affect and normal mood and her condition was no longer listed as "not improving"; she reported feeling better, more stable, and calmer. Tr. 287.

On November 24, 2014, Flores saw Dr. Gutierrez. Findings were similar to before except that her concentration was diminished, her judgment was downgraded to fair, her introspection was diminished, she was not noted to be oriented in place, her affect was restricted, and her mood was in part irritable, though she was again noted to be friendly; she was still sad, anxious, and irritable, but had apparently not done a good job of taking her medications. Tr. 283-84. On March 13, 2015, Dr. Gutierrez and Flores met. Her judgment and introspection had returned to good and adequate and she was oriented in place; she had gone off of medication for a month, but was still

depressed and anxious, and she was suffering insomnia due to bodily pain; she was restarted on her previous pharmacotherapy as a result. Tr. 275-76.

On March 19, 2015, Dr. Santiago saw Flores. Her affect was appropriate and her mood was normal; she reported a decrease in libido and still supposedly had episodes of irritability and anger. Tr. 279-80.

On March 25, 2015, Dr. Caroline Rodriguez Ferrer took an MRI of Flores's cervical spine. She noted a broad-based disc bulge abutting the spinal cord with uncovertebral joint arthrosis and facet hypertrophy causing narrowing of the neuro foramina at C3-C4, C5-C6, and C6-C7; disc desiccation with a broad-based disc bulge and bony ridges indenting the spinal cord with uncovertebral joint arthrosis and facet hypertrophy causing narrowing of the neuro foramen on the right at C4-C5; and otherwise normal findings. Tr. 464. She found that Flores had cervical spondylotic changes with multilevel degenerative disc disease. *Id*.

On May 11, 2015, psychiatrist Dr. Ivan Martinez Deliz ("Dr. Martinez") noted that in October 2014, Flores had developed low back pain without experiencing any trauma; the pain subsequently radiated to her right lower extremity in December 2014, while she began experiencing numbness and cramps in her hands in November 2014. Tr. 1025. Dr. Martinez noted that she had a history of gastritis and hypertension, as well as operations related to her mitral valve and perhaps other conditions as well; he noted previous medical findings regarding her spine, said she had scoliosis, stated that she had a positive Phalen test and a positive Tinel sign (each bilaterally), noted that she had a negative Patrick test, diminished strength of some kind, and sensory changes. Id. Dr. Martinez made other findings that are largely illegible. *Id*.

On June 1, 2015, Dr. Gretchen Enriquez Figueroa ("Dr. Enriquez") spoke with Flores. The findings were essentially the same as they were at Flores's last visit with Dr. Santiago; though

Flores was still diagnosed with recurrent moderate major depressive disorder, she was not noted as having anything other than normal reactions, behavior, and abilities. Tr. 271-72. She had gone off of her medications for a month again and reported anxiety and depression, and she was apparently studying at the time. Tr. 272.

On August 15, 2015, Flores reported pain in her back, neck, and limbs to Dr. Hector Vargas Soto ("Dr. Vargas"). The pain was allegedly aggravated by walking for a distance, bending, twisting, or lifting. Tr. 447. Dr. Vargas also made other illegible notes at the time. *Id*.

On August 27, 2015, Dr. Jose Gandara Perea noted that Flores's spine was showing straightening of the normal cervical curvature. Tr. 466.

On September 2, 2015, Dr. Axel Baez Torres noted that Flores had lumbar stenosis. Tr. 467. That same day, Dr. Vargas noted that Flores underwent surgery due to cervical stenosis and had titanium implants put in as part of a decompression and cervical posterior fusion. Tr. 468. Dr. Vargas said that Flores would be unable to work until September 21, 2015 and noted that she was in the process of recovery with certain restrictions, including being limited to carry no more than fifteen pounds above shoulder height, pushing and pulling no more than fifteen pounds, bending down or twisting no more than three times consecutively. *Id*. She was not permitted to squat, lean forward or backward, swing, perform activities that require sudden impulses, walk long distances, go up more than ten steps in a row, or go on trips longer than twenty-five minutes without rest. *Id*.

On September 16, 2015, Flores attended her first post-op with Dr. Vargas. Tr. 445. Dr. Vargas noted that Flores was walking with good posture, did not report any discomfort or pain in the operation area, and had a clean wound area without bleeding or discharge. *Id*. Her diagnosis at the time was cervical stenosis. *Id*.

On January 28, 2016, Flores met with Dr. Enriquez. Her results were the same as those from her last visit, though her condition was actually noted to be improving; she had missed an appointment due to a cervical operation and was anxious due to life issues, though she was apparently doing pharmacy technician practice; and she still reported anxiety, sadness, and insomnia. Tr. 266-68. Dr. Enriquez saw Flores again on February 24, 2016. Her findings were the same as at the last visit; she was noted to be improving, had a good response to the pharmacological plan, and reported feeling better with good tolerance of her medications. Tr. 261-63.

On May 24, 2016, Dr. Ismael Medina Agostini ("Medina") saw Flores. Though she was not physically evaluated, Medina noted that Flores had anxiety, rhinitis allergies, hypertension, gastritis, and gynecological issues. Tr. 257-58. Her findings were otherwise typical and normal, though she was noted to behave spontaneously; she still reported anxiety and crying due to her grandmother's death and her Zoloft prescription was adjusted. Tr. 254-55. On November 10, 2016, Medina saw Flores again. This time she was noted as not having any physical complaints, though no physical exam was conducted. Tr. 250-51. Her findings were normal and her response to treatment was good, though she reported that she had lost access to her medications; she was noted to have a history of hypertension and cervical issues. Tr. 247-49.

On January 3, 2017, Flores had surgery conducted by a Dr. Suriel, who gave her a pre-operative diagnosis of chronic pelvic pain and a left ovarian tumor, among other things. Tr. 741. Most of Dr. Suriel's other notes and diagnoses are illegible. *Id*. On January 15, 2017, Dr. Victor Collazo studied Flores's left ovary, which had been removed during the surgery and had a leiomyoma that he characterized as a rare type of tumor. Tr. 365. He also examined endometrium and peritoneal fluid that had been removed during the surgery, but did not note anything abnormal when it came to those samples. *Id*.

On January 18, 2017, Dr. Hans Rivera Colon ("Rivera") saw Flores. His findings were the same as at Flores's previous visit with Medina. Tr. 241-43. She had recently had a hysterectomy and had not been taking her medication for a month as a result; Rivera noted that she had a history of hypertension, gastritis, scoliosis, lumbar issues, and had previously had an operation for cervical arthritis as well as the hysterectomy. Tr. 240.

On January 24, 2017, Dr. Julio Soler Villanueva ("Dr. Soler") was visited by Flores. His findings were largely standard, but Flores was noted to appear heavy instead of thin. Tr. 237-39. She reported periods of sadness and irritability; however, Dr. Soler noted that she performed activities of daily living adequately for her condition. Tr. 236. He also noted that she had a latex allergy. *Id*.

On January 25, 2017, radiologist Dr. Jose Ganara Perea found spondylolisthesis, disc space narrowing, and disc degeneration in Flores's spine. Tr. 1050. He also noted a disc bulge resulting in the narrowing of the left neural foramina, a small hemangioma, small nabothian cysts, and otherwise apparently largely normal findings. *Id*. A month earlier he had also stated that Flores was suffering from minimal scoliosis. Tr. 1051.

On February 6, 2017, Dr. Yaritza Lopez Robledo ("Dr. Lopez") conducted a clinical interview and mental status examination with Flores. Tr. 200. Flores arrived at the interview with her uncle, who had driven her there. Tr. 201. Flores claimed that she had a fibroid removed, suffered from endometriosis, underwent cervical surgery in 2015, had degenerative arthritis above her cervical spine, had lumbar levoscoliosis, had spurs, and suffered from a spinal hernia. *Id*. She also noted suffering from gastritis, allergic rhinitis, hypertension, and a left mitral valve issue. *Id*. She claimed to have feelings of sadness, guilt, insomnia, lack of energy, lack of appetite, poor concentration, poor motivation, and ennui. *Id*. She took medicines including Hydroxyzine,

Sertraline, Atenolol, and Hydrochlorothiazide, which she was able to administer herself without supervision. Tr. 202. Dr. Lopez found that Flores suffered from cervical issues, degenerative arthritis, a back condition, a back hernia, mitral valve prolapse, allergic rhinitis, gastritis, endometriosis, high blood pressure, and lumbar scoliosis. *Id*. Dr. Lopez also noted that Flores had undergone multiple surgeries, including a hysterectomy, back surgery, and gallbladder surgery. *Id*. She had no family history of mental health conditions but did have an uncle who had received psychiatric treatment for a suicide attempt or attempts. *Id*. Flores had no history of legal problems or any difficulties with the community. Tr. 203.

Flores claimed to not be able to do things at home but stated that she had a husband, two biological children (ages five and nine at the time), and two stepchildren (ages sixteen and nineteen at the time) that she lived with. *Id*. She was able to care for her own hygiene, make her children breakfast and lunch, dress them, drive them to school, cook, sweep, do laundry, care for pets, handle money matters, and do homework, although she claimed that she had stopped studying due to her recent hysterectomy. *Id*. Flores denied engaging in much entertainment but said that she got along well with family members, friends, and neighbors, denying that she faced any interpersonal difficulties. *Id*. She also reported having adequate past relationships with co-workers and supervisors at her previous jobs. *Id*.

Flores was dressed adequately for the situation and appeared to be neat and clean as well as alert with adequate posture and with appropriate height and weight for her age. *Id*. She was calm and cooperative during the interview, making adequate eye contact and displaying adequate psychomotor ability. Tr. 204. She apparently became emotional and cried when discussing abusive experiences she had lived through as a child. *Id*. She seemed slightly depressed but with appropriate affect; her speech was coherent, relevant, logical, and somewhat spontaneous; she was

able to establish good rapport and answer all questions; she did not display disorganized thought processes or delusions; and she had no history of psychotic experiences, obsessions, strange ideations, or the like. *Id.*

Flores was oriented as to time, place, person, and circumstances. *Id.* During the interview, her level of cooperation was adequate and she answered consistently. *Id.* She was able to fully repeat the names of five objects after they were mentioned to her (as well as repeat the names of four of the five objects after five minutes had elapsed); recall how she arrived at the interview site; recall activities she had performed the day before; and recall her birthplace, birth date, and the day she finished working. Tr. 204-05. Her level of concentration was adequate and she was able to concentrate; she did not need questions repeated, seemed to fully understand them, and followed conversation appropriately. Tr. 205. She was also able to spell the word "world" in Spanish ("mundo") correctly both backwards and forwards. *Id.* However, Flores was unable to successfully count backwards from thirty by threes, correctly stating the number "twenty-seven" first but then miscalculating by one and giving the number "twenty-three" next. *Id.* She may have also been unable to fully recite the days of the week; Dr. Lopez notes that she was able to repeat six of the seven days, but she does not explain what happened in regards to the last day (Sunday). *Id.* Dr. Lopez found that Flores's general knowledge was appropriate for her age and academic background. *Id.* Flores was also able to name the capital of Puerto Rico, correctly name fruits, state the name of Puerto Rico's governor, state the correct term between elections, identify similarities between different items, correctly interpret idiomatic phrases, and identify current social events. *Id.* She successfully performed simple addition, subtraction, and multiplication exercises. *Id.* Dr. Lopez concluded that Flores's prognosis was somewhat favorable when it came to her emotional

condition and found that she displayed mostly symptoms related to mood that were consistent with a diagnosis of recurrent and mild major depressive disorder. Tr. 206.

On February 28, 2017, Flores had a mental evaluation with a State agency psychological consultant, Eunice Lasanta Falcon. Tr. 769. Lasanta found that Flores was slightly depressed, oriented, had fully intact immediate and short term memory, had preserved recent and long-term memory, adequate attention and concentration, and good insight. *Id*. Lasanta diagnosed Flores with mild and recurrent major depressive disorder but noted that she was able to handle funds. *Id*. Flores was apparently alert and coherent during the interview. *Id*.

On March 6, 2017, Dr. Luis Rodriguez noted that Flores had the medically determinable impairments of a severe spine disorder, severe carpal tunnel syndrome, and a non-severe depressive, bipolar or related disorder. Tr. 774. He found that her limitations when it came to understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself were all mild. *Id*. He noted that her immediate and short-term memory were fully intact and that her recent and long-term memory were also preserved; he also stated that she had adequate attention and concentration and noted that her mental condition was not severe. *Id*.

On March 13, 2017, Dr. Caroline Rodriguez Ferrer noted that right shoulder radiology of Flores revealed maintained joints, no abnormal soft tissue calcification, and no evidence of fracture or subluxation. Tr. 463. Sacrococcyx radiology revealed a ventral angulation of the coccyx (noted to be an anatomic variant) with no new fracture and unremarkable sacral neuro foramina, but mild subchondral sclerosis of both sacroiliac joints noted to most likely be degenerative in nature as well as a pelvic phlebolith on Flores's left. *Id*.

On March 14, 2017, radiologist Dr. Jorge Torres Nazario found that lumbosacral spine imaging showed normal spine lordosis but with some narrowing of an intervertebral disc space with the possibility of discogenic disease. Tr. 1071.

On March 21, 2017, Flores met with Rivera. Her findings were normal; she was noted as being stable under her current medical plan and there was a good response as far as the pharmacological plan was concerned. Tr. 229-32.

Flores was scheduled for an epidural lumbar block on April 3, 2017. Tr. 477. On April 9, 2017, Dr. Vargas noted that Flores had injuries or sequelae from surgeries on her spinal column with remaining severe or permanent muscular deficiencies that limited her movement; he commented that this was related to her operation on the neck and back and weakness in her hands and legs. Tr. 452.

On April 28, 2017, Dr. Pedro Nieves ("Dr. Nieves"), a consultative examiner for the government, reported his findings regarding Flores. Dr. Nieves noted that Flores was casually dressed and groomed, appearing tired and with little energy, but otherwise normal-seeming with no oddities in her behaviorisms or manner. Tr. 771. However, she did seem to be in pain, moving about in her chair and rubbing her lower back on several occasions. *Id*. Dr. Nieves noted that she had numbness of hands in all sorts of circumstances and suffered from back, knee, and sciatic pain, limiting her ability to perform household chores. Tr. 772. She suffered from depression that made her irritable, tearful, fatigued, and without motivation, and she suffered from insomnia. *Id*. However, she could drive, cook, perform some household chores with help, shop, handle funds, and walk for fifteen minutes at a time with five minutes of rest needed afterwards. *Id*. Dr. Nieves noted Flores's surgeries and other components of her medical history before concluding that Flores

had the residual functional capacity for light work with manipulative and postural limitations; furthermore, her mental condition was evaluated as not severe. *Id*.

Regarding Flores's limitations, Dr. Nieves found that she could occasionally lift and carry up to twenty pounds; frequently carry up to ten pounds; stand or walk for a total of about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; push and pull unlimitedly; climb ramps and stairs frequently; climb ladders, ropes, or scaffolds occasionally; balance frequently; stoop occasionally; kneel frequently; crouch frequently; crawl occasionally; reach unlimitedly; and use either or both hands for handling, manipulation, and feeling limitedly due to pain and tenderness. Tr. 775-77. Dr. Nieves also noted that Flores had no visual, communicative, or environmental limitations. Tr. 777. He noted that she had remnant tenderness after her cervical surgery over her back as well as other issues like carpal tunnel in her hands that caused her pain and tenderness, but said that her motor function in her hands was preserved nonetheless. *Id*. He concluded that no listing was met or equaled by Flores's symptoms, but that her condition warranted that she be treated as having an RFC with the above limitations. *Id*. The overall conclusion of the government examiners was that Flores was not disabled. Tr. 779.

On May 4, 2017, Dr. Manuel Martinez found that Flores had symptoms compatible with severe right and moderate to severe left median nerve entrapments and appeared to relate the symptoms to Flores's carpal tunnel (though portions of the findings are illegible). Tr. 432.

On May 11, 2017, Dr. Leonell Freytes Santiago summarized Flores's medical history and condition by saying that Flores had a six-year history of pain in her neck, low back, and hands for which she denies any particular inciting incident. Tr. 1063. Flores apparently cited shooting neck pain that occurs on most days at a ten out of ten intensity that also radiated to her trapezius and upper to mid back; she said that symptoms improved after her cervical spine surgery in 2015 but

then worsened again more recently. *Id*. Flores also cited constant ten out of ten pain in her lower

back radiating to her right buttock and posterior thigh with associated occasional pins and needles

sensations in her right leg. *Id*. She also referred to pain in her hands localized to her first, second,

and third fingers with associated occasional weakness, numbness, and pins and needles sensations.

*Id*. Dr. Freytes conducted a physical exam on Flores; he noted that her neck had decreased range

of motion and that there was tenderness to palpation over her cervical spine, paraspinal muscles,

and trapezius muscles, but that she had normal muscle tone. Tr. 1065. He also noted that her back

had tenderness to palpation over her lumbosacral spine, paraspinal muscles, and lower back and

that sitting and supine straight leg raises caused her pain in her lower back, but found that she had

normal muscle tone, no resistance to flexion and extension, and normal range of motion. *Id*. He

also found that she walked with a normal gait using no assistive device and was able to walk on

her toes, on her heels, and in tandem. Tr. 1065-68. He noted no issues or lack of ability pertaining

to her extremities except for some decreased sensation in her right hand and found that she had

five out of five strength of all her upper and lower extremities with no atrophy; she did have

positive Tinel and Phalen tests bilaterally. Tr. 1066-68. She also had joint pain and tenderness

bilaterally. Tr. 1068.

On June 19, 2017, Dr. Enriquez spoke with Flores. Tr. 227. Flores reported that she was

experiencing conflict with her daughters and her husband, which made her irritable and anxious;

she also reported physical health conditions that worsened her emotional condition. Tr. 222. She

was noted to be thin, with appropriate hygiene, dress, and physical appearance; her verbal

expression, attitude, and behavior were calm and appropriate; her gross and fine motor skills,

mood, affect, and impulse control were adequate, appropriate, and normal; her thought processes

were logical; and she had no signs of attention deficit disorder. Tr. 223. She had no hallucinations

or delusions. *Id*. Her cognitive functions and memory were fully intact and she displayed good judgment, adequate concentration, and adequate introspection. Tr. 224. She had no noted head, eye, ear, nose, throat, chest, heart, respiratory, circulatory, endocrine, gastrointestinal, genito-urinary, musculoskeletal, neurological, hematopoietic, lymphatic, immunological, gynecological, or nutrition issues, though only a limited range of issues were covered. Tr. 225. She also had no listed communicable diseases or issues with alcohol or cigarettes, nor did she have any listed immunizations. Tr. 225. However, Flores was not actually physically evaluated. Tr. 226. She remained diagnosed with recurrent and moderate major depressive disorder as well as problems related to her primary support group and was still prescribed Vistaril and Zoloft. Tr. 227.

On June 28, 2017, Dr. Vargas scheduled Flores for decompression and lumbar fusion due to her lumbar stenosis; the surgery was supposed to be performed on August 21, 2017. Tr. 476. However, it may have been performed one day later instead. Tr. 479.

On August 18, 2017, consultative examiner for the government Laura Villanueva Nieves concluded that Flores's condition had not worsened since the government examiners had examined her before and recommended that the prior examination results be adopted. Tr. 788. Dr. Jesus Soto, another government examiner, made the same recommendation on September 13, 2017, as did Dr. Lourdes Marrero on September 12, 2017. Tr. 790-91. The overall report reached the same conclusion of not disabled. Tr. 797.

On August 24, 2017, Dr. Axel Baez Torres noted that Flores had lumbar stenosis, with lumbar decompression comprised of degenerated fibrocartilage, osseous tissue, and skeletal muscle fibers. Tr. 462.

On October 6, 2017, radiologist Dr. Gilberto Franceschini noted upon viewing lumbar spine radiographs that Flores had levoscoliosis of the lumbar spine, fixation screws installed with

hemilaminectomy, some past disc replacement, normal lumbar lordosis, cholecystectomy, probable transitional vertebra normal variant, and constipation. Tr. 461.

On October 10, 2017, Dr. Enriquez filled out progress notes regarding Flores. She noted that Flores was still taking Zoloft and undergoing drug therapy and management, stated that her progress was stable, and noted no findings at substantial variance from previous visits. Tr. 689-90.

On October 13, 2017, Dr. Vargas noted that at the time Flores was restricted to no pushing or pulling over ten to fifteen pounds, no lifting anything more than twenty to twenty-five pounds over her shoulder level, and no twisting or bending her lower back. Tr. 306.

On November 8, 2017, Dr. Enriquez spoke with Flores yet again. None of the findings were significantly different from before or clearly abnormal. Tr. 682-84. Flores was not exhibiting physical symptoms, her condition was stable, and there was good achievement of the pharmacological plan's goals. Tr. 682. Also on November 8, 2017, Dr. Ruben Torres Benitez prescribed Flores with bilateral wrists splints for carpal tunnel at night. Tr. 1493.

On January 23, 2018, Dr. Vargas referred Flores to an anesthesiologist for pain management. Tr. 460. Also on January 23, 2018, Flores saw a therapist who noted that she had persisting neck pain that Flores rated nine out of ten, slightly improving lumbar pain that Flores rated eight out of ten, and lots of headaches. Tr. 486.

On March 1, 2018, Dr. Rivera saw Flores. She had just gone off of Zoloft but had a new prescription for Cymbalta and remained on Vistaril. Tr. 674. She was having insomnia issues, but was noted as having a stable condition with no physical complaints, and none of her findings were abnormal, though she was noted as having (or having previously had) hypertension, gastritis, fibromyalgia, cervical issues, and degenerative arthritis. Tr. 674-80.

On March 29, 2018, Dr. Enriquez saw Flores. None of her findings were unusual or obviously abnormal; she was noted to have high but stable blood pressure, scoliosis, fibromyalgia, and arthritis; and she was apparently tolerating the Cymbalta well but was still suffering from symptoms of pain. Tr. 666-72.

On April 26 and 28, 2018, Dr. Alejandro Lopez Araujo performed cervical and thoracolumbar spine radiographs on Flores and noted the presence of two screw and rod fixations on parts of her spine, but also found that her vertebral bodies were normal in height and alignment, that she had no acute fractures or suspicious lesions, that her disc spaces were uniformly normal, and that her visualized chest structures and her surrounding tissues were unremarkable; he did note surgical clips in the right upper quadrant of her thoracolumbar spine radiographs, theorizing that they were the sequelae of prior cholecystectomy. Tr. 456-57.

Flores apparently had an automobile accident on April 26, 2018. Tr. 488. On May 25, 2018, Dr. Arturo Lopez Rivera ("Dr. Lopez Rivera") saw Flores in relation to the accident. *Id*. He noted that she complained of pain in her neck, upper trapezium, and mid to low back that she had suffered from for about a month after being in her car accident. Tr. 489. Dr. Lopez Rivera noted that she had had cervical spine surgery on September 2, 2015 and lumbosacral spine surgery on October 22, 2017; the surgical work was still intact. *Id*. Flores claimed to have swelling and muscle spasms on her spine and back post-accident. *Id*. She also claimed to have constant pain that would worsen if she made certain movements. *Id*. When conducting an objective test on Flores, Dr. Lopez Rivera noted that her blood pressure was 144/97, her BMI was 28.29, her height was 5'5", and her pulse was 104. Tr. 490. She was alert, oriented, and well-hydrated with a normal gait. *Id*. She had tenderness in her cervical paravertebral muscles, upper trapezium, dorsal paravertebral muscles, and lumbosacral paravertebral muscles in addition to muscle spasms in her cervical area, upper

trapezium, dorsal area, and lumbar area. *Id*. However, she had normal range of motion in her upper and lower extremities, but limited range of motion in her neck, with limited flexion, limited lateral flexion, and limited rotation to the left and right. *Id*. Her trunk had full range of motion but Flores would experience pain at the end of her range. *Id*. She had normal muscle tone, normal sensation, and full muscle strength in her upper and lower extremities; however, she did have a positive straight leg raise test in her right lower extremity at 60 degrees. Tr. 490-91. Dr. Lopez Rivera assessed Flores as having cervicalgia, back muscle spasms, myalgia, and intervertebral disc disorders with radiculopathy in her lumbosacral region. Tr. 491.

On May 1, 2018, Dr. Raul Llinas Sobino ("Dr. Llinas") saw Flores. She allegedly had constant generalized pain symptoms rated a ten out of ten in severity. Tr. 413. She had numbness, tingling, and weakness in her hands and feet. *Id*. Her pain was aggravated by stress and cold and alleviated by heat and massage. *Id*. Most of Dr. Llinas's other findings were illegible. *Id*.

On April 26 and 28, 2018, Dr. Alejandro Lopez Araujo performed cervical and thoracolumbar spine radiographs on Flores and noted the presence of two screw and rod fixations on parts of her spine, but also found that her vertebral bodies were normal in height and alignment, that she had no acute fractures or suspicious lesions, that her disc spaces were uniformly normal, and that her visualized chest structures and her surrounding tissues were unremarkable; he did note surgical clips in the right upper quadrant of her thoracolumbar spine radiographs, theorizing that they were the sequelae of prior cholecystectomy. Tr. 456-57.

On July 18, 2018, Dr. Llinas found that Flores had bilateral moderate carpal tunnel syndrome and believed that studies suggested that she may have "peripheral sensory more than motor demyelinating neuropathy involving the bilateral lower extremities." Tr. 418. Dr. Llinas recommended clinical correlation as a result. *Id*.

On August 5, 2018, a Dr. Jose Rios Orlando diagnosed Flores with bilateral neck and lumbar muscle spasms. Tr. 487.

On August 22, 2018, Flores saw Dr. Soler. Flores's concentration and introspection were noted to be diminished, and her judgment had been downgraded to fair from good. Her affect was anxious and depressive, she was exhibiting mild attention disorder, and her mood was anxious and depressed; she was also noted to appear as "heavy" instead of her typical "thin." Tr. 663. Her other findings were standard for her. Tr. 663-65. Flores expressed that she was feeling anxiety as well as restlessness, tachycardia, depression, irritability, anhedonia, insomnia, and hyperphagia. Tr. 662.

On September 5, 2018, Dr. Llinas stated that Flores had carpal tunnel syndrome with peripheral neuropathy; he also said that she may have fibromyalgia. Tr. 423. He also made a treatment plan that included injecting steroids into Flores's wrist or wrists. *Id*. He noted that she still had constant generalized pain with numbness, tingling, and weakness in her hands and feet rated a nine out of ten for pain and aggravated by stress, cold, and insomnia but alleviated by rest, heat, and physical therapy. Tr. 425. He also noted that she was experiencing diarrhea, constipation, TMJ, anxiety, depression, insomnia, and fatigue. *Id*. His other notes were largely illegible. Tr. 423-25. On September 18, 2018, Dr. Llinas noted that Flores claimed to be experiencing constant generalized pain at a nine out of ten level with numbness, tingling, and weakness in her hands and feet aggravated by stress, insomnia, and cold but alleviated by physical therapy (although this time Dr. Llinas did not note that the pain could be alleviated by heat or massage). Tr. 422. He also noted that she was experiencing diarrhea, constipation, and TMJ. *Id*. His other findings were as usual largely illegible. *Id*. On September 5 and September 18, 2018, Dr. Llinas noted that he gave Flores some sort of steroid injection in her wrist or wrists, but his notes are difficult to read or follow. Tr.

436-37. On October 23, 2018, Dr. Llinas apparently gave Flores some sort of injection for her carpal tunnel, but his notes on the matter are again illegible. Tr. 435.

On October 17, 2018, radiologist Dr. Amando Marquez ("Dr. Marquez") noted that Flores had undergone spinal fusion, but that she currently had no fractures or sublaxation and that her vertebral height, alignment, and intervertebral spaces were all maintained. Tr. 455.

On October 19, 2018, Dr. Enriquez saw Flores again. Her findings were all standard and essentially back to what they had typically been before the appointment with Dr. Soler on August 22, 2018. Tr. 656-60. She was noted to have a better mood and good tolerance of her new medication, but still experienced pain that apparently limited her in her daily life. Tr. 654.

On March 13, 2019, a Dr. Jose Ballester ("Dr. Ballester") concluded that Flores was permanently disabled for the purposes of a nutritional assistance program. Tr. 512. However, Dr. Ballester provided little to no legible explanation for his finding other than noting that Flores had a neurological or neuromuscular condition, a mental condition, and fibromyalgia. *See* Tr. 512-21 (almost entirely made up of illegible handwritten notes).

On March 26, 2019, a few months after her date last insured, Flores visited a physical therapist. The therapist found that Flores's condition with her hands was declining and that she should see a hand surgeon for an evaluation. Tr. 752. The therapist also noted that her pain remained at 9/10, her right hand grip strength was 8 kg (down from 16 kg), and her left hand grip strength was 9 kg (down from 14 kg). *Id*.

On April 4, 2019, Flores appeared at a hearing before an administrative law judge ("ALJ"). The ALJ noted that the record suggested that Flores may have had scoliosis, mental health issues, depression, high blood pressure issues, allergies, gastritis, and a fibroid in one ovary. Tr. 52-53. The ALJ also noted that she had had cervical surgery in September 2015 and lumbar surgery in

2017. Tr. 53-54. Flores apparently also had fibroid surgery and concurrently had one of her ovaries removed. Tr. 56. The ALJ mentioned that Flores had carpal tunnel syndrome in both hands as well; Flores described the condition as painful and noted that it often caused her hands to go numb. Tr. 54. She also claimed that therapy and injections had not helped the condition improve. Tr. 55. Flores noted that she was still receiving treatment for depression and that she was taking medications for her depression and hypertension, but that the conditions had not been under control for several months. Tr. 55-56. She reported constant pain in her back, cervical area, hip area, hands, legs, and elbows as well as general weakness, tiredness, and numbness in her legs and hands that would last for around five minutes at a time. Tr. 65-66. Medications would reportedly relieve these symptoms for a couple of hours but not make them go away entirely. Tr. 67. Flores also reported concentration problems. Tr. 67. She said that surgery and therapy had not helped her pain. Tr. 68. She asked for leave to stand on multiple occasions during the hearing before the ALJ due to experiencing pain. *See, e.g.*, Tr. 62.

Flores claimed to perform household chores like sweeping and washing clothes, but that she only did so with help; she also claimed to be unable to mop. Tr. 56-58. She was able to drive on her own. Tr. 57. She had a good relationship with her immediate family but reported sometimes having issues interacting with others in public settings due to anxiety; however, she reported being able to engage in standard interactions at the doctor's office, to not have any problems with her treating physicians, and to not have any problems with her neighbors. Tr. 58-59. However, she also stated that she would be unable to interact with the public as an employee due to anxiety and stress, that she would forget instructions due to her fibromyalgia, and that she would be unable to interact with coworkers because she becomes irritated easily. Tr. 65. She claimed to not be able to carry anything heavier than a gallon of milk, to not be able to stand without sitting for more than fifteen

to twenty minutes at a time due to back pain and leg numbness, to not be able to walk for more than five to ten minutes at a time due to the same issues, and to not be able to sit without standing for more than half an hour. Tr. 59-61. After standing for fifteen or more minutes she would need a break of around the same period of time and after walking for five to ten minutes she would need a break of twenty minutes up to half an hour. Tr. 64. She also claimed to not be able to drive for more than fifteen minutes at a time due to her hands becoming numb. Tr. 62-63. Within a given eight-hour period, she would allegedly have to lie down from around thirty or forty minutes to up to an hour. Tr. 63-64. Flores said that she took Clonazepam, Cymbalta, Propranolol, Norvasc, and Hydroxyzine. Tr. 61.

A vocational expert, Dr. Puig, testified at the hearing before the ALJ, but his statements are not in dispute. Tr. 69.

The ALJ issued his opinion on May 17, 2019. Tr. 31. The ALJ stated that Flores last met the insured status requirements of the Social Security Act on December 31, 2018. Tr. 23. He acknowledged that she had not engaged in substantial gainful activity after her alleged onset date of June 1, 2013. *Id*. The ALJ then found that Flores had the severe impairments of degenerative disc disease of the cervical and lumbar spine, spine levoscoliosis, bilateral carpal tunnel syndrome, and sacroiliac joint degeneration. *Id*. He noted that she had been diagnosed with status post resection ovarian fibroma, but that no residual pain or limitations had been reported in regards to this condition, and accordingly it was non-severe; he also found that even though Flores had been diagnosed with hypertension, a mitral valve prolapse, and reversible ischemia, that normal scans and other medical results showed that those conditions were non-severe as well. *Id*. The ALJ also found that Flores's major depressive disorder caused at most minimal limitations in Flores's ability to perform basic mental work activities and that therefore it was non-severe. Tr. 24. In reaching

this conclusion, the ALJ found that Flores only had mild limitations in all four areas of mental functioning set out in the disability regulations for evaluating mental disorders (the "Paragraph B" criteria): understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Tr. 25.

The ALJ then found that Flores's impairments did not meet or medically equal a "listed" impairment for social security purposes. The ALJ considered Listings 1.02, 1.04, and 11.00(C), but found that Flores did not meet Listing 1.02 because she did not have an inability to perform fine and gross movements effectively or an inability to ambulate effectively; that she did not meet Listing 1.04 because the record did not show she had motor loss, muscle atrophy or weakness, or sensory or reflex loss, instead having the ability to ambulate effectively and perform fine and gross motor movements; and that she did not meet Listing 11.00(C) because there were no clinical findings indicating that she was unable to use her upper extremities effectively or suggesting any of the other limiting symptoms required by the listing. Tr. 25-26.

The ALJ then concluded that Flores had the RFC to perform sedentary work except with some further limitations. Tr. 26. These limitations included only frequent reaching in all directions with her upper extremities; frequent handling, fingering, and feeling bilaterally; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing; occasionally stooping, but never crouching, kneeling, or crawling; occasionally operating a motor vehicle for work activities; never working at unprotected heights or with moving mechanical parts; occasionally being exposed to extreme cold or heat; and occasionally being exposed to vibrations. *Id*. In reaching this conclusion, the ALJ claimed that Flores's statements regarding the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the record, noting that although the medical record supports her allegations regarding neck, low back, and bilateral

hand pain, the record reflects that she had normal gait, full muscle strength, intact reflexes, normal range of motion in all extremities and in her spine, and the capability to perform gross and fine manipulation. Tr. 28.

The ALJ also considered opinion evidence in reaching his conclusions regarding Flores's RFC. The ALJ determined that Dr. Vargas's opinion merited partial weight, as the ALJ believed that the record as a whole did not suggest additional limitations in Flores's ability to push and pull, stand or walk, and alternate between sitting and standing. *Id*. The ALJ said that Dr. Ballester's opinion merited little weight, as his conclusion that Flores was disabled was for the purposes of another program and such conclusions are reserved for the Commissioner of Social Security. Tr. 29. The ALJ then gave partial weight to the physical assessments of the government medical consultants, as the ALJ believed that the record reflected that Flores should be limited to sedentary rather than light work and that she should be limited in exposure to workplace hazards. *Id*.

The ALJ then determined that Flores was unable to perform any of her past relevant work. *Id*. However, the ALJ determined that Flores could perform other jobs that exist in significant numbers in the national economy. Tr. 30. In support of this notion, the ALJ cited the testimony of a vocational expert who testified at Flores's hearing before the ALJ. Tr. 30-31. As a result, the ALJ concluded that Flores was not disabled. Tr. 31.

Flores requested that the Social Security Administration Appeals Council review the ALJ's determination and the Appeals Council denied her request. Tr. 1. Flores then filed the present action. Dkt. 1.

## DISCUSSION

Flores challenges the ALJ's conclusions regarding her depression, Listing 1.02, and Listing 1.04, and appears to implicitly challenge the ALJ's conclusion regarding her RFC as well.

The ALJ determined that Flores did not have a severe impairment when it came to her depression. In coming to this determination, the ALJ considered Flores's depression in accordance with Listing 12.04, the Social Security listing for depressive disorders. In order to meet this listing, a claimant must be at least extremely limited in one or markedly limited in two of the following four areas: 1) her ability to understand, remember, or apply information; 2) her ability to interact with others; 3) her ability to concentrate, persist, or maintain pace; and 4) her ability to adapt or manage herself.

The ALJ's conclusion regarding the first functional area is justified. Despite Flores's allegations, it is clear that the ALJ considered the fact that Flores could not remember all of the days of the week and could not successfully count backwards three digits at a time from thirty. The ALJ cites the portion of the record containing those findings in concluding that Flores displayed "good to intact memory and average intellectual functioning." Despite Flores's protests, those findings are not inconsistent with that conclusion; it is feasible that an individual could have overall "good to intact" memory but not recall one of the days of the week and "average intellectual functioning" without the ability to count backwards by threes from thirty. In fact, during the same examination that revealed those findings Flores displayed no obvious issues with intellectual functioning or memory despite being asked a range of questions that required her to remember things, make calculations, and similar. I will not disturb the ALJ's findings if the ALJ's interpretation of the evidence is feasible and if the evidence substantially supports such a finding. *See, e.g., Rodriguez Pagan*, 819 F.2d at 3 (the court must affirm the ALJ's findings even if the record could arguably justify a different conclusion if the findings are supported by substantial evidence). It would have been preferable for the ALJ to more explicitly deal with these findings; however, the portions of the evidence that the ALJ cites adequately support the ALJ's conclusion.

Incidentally, Flores also claims that it was incorrect for the ALJ to state that Flores received psychiatric treatment every three to six months. Even assuming that the ALJ's statement was incorrect, however, the ALJ does not indicate or imply that this point weighed against Flores or even that it was a consideration at all. Accordingly, the ALJ's conclusion regarding the first functional area was sufficiently justified.

The ALJ's conclusion regarding the second functional area is also justified. Again, it would be preferable if the ALJ provided explicit analysis of portions of the record that tend to undermine the ALJ's conclusion, such as Flores's testimony at the ALJ hearing that she sometimes had difficulties getting along with others. This is particularly true where the ALJ cites that same testimony in a later portion of the determination, as pointed out by Flores. Nonetheless, it is reasonable for the ALJ to conclude that Flores's limitations in interacting with others are only mild given the record as a whole and the specific evidence cited by the ALJ. Although Flores did testify before the ALJ that she believed she would find it difficult or impossible to interact with others within a work environment, Flores identifies nothing else in the record that clearly supports this claim, and in fact the record reflects many instances in which Flores was more than capable of interacting with others appropriately over an extended period of time, such as her physicians, caregivers, and family members. Again, I will not disturb the ALJ's findings if they are substantially supported even if other interpretations are possible. *See, e.g., Rodriguez Pagan* at 3.

The ALJ's conclusions regarding the third functional area are also justified. Flores makes much of the fact that the ALJ only cites a single consultative evaluation in support of this conclusion (plus other exhibits that do not actually touch upon the issue), but Flores fails to identify any evidence that would tend to undermine the ALJ's decision, and it is clear that the ALJ did not "create his own opinion" despite Flores's claims. Despite Flores's failure to successfully count

backwards by threes from thirty during the consultative examination in question, the ALJ's conclusion that Flores's attention, concentration, and ability to perform simple calculations were intact is reasonable. Flores was able to perform other addition, subtraction, and multiplication calculations successfully during the same examination, Tr. 205, and whether or not counting backwards from thirty by threes is a "simple" calculation is a debatable proposition.

Finally, while Flores makes the somewhat legitimate point that the ALJ should support conclusions more fully with more detailed discussions of the record, the ALJ's conclusion regarding the fourth functional area is also justified. The ALJ cites exhibits that sufficiently support the notion that Flores's insight and judgment are adequate to good and that she is able to take care of her own hygiene; Flores, meanwhile, cites no evidence that would tend to show that the ALJ's conclusion that she only has mild limitations when it comes to adapting or managing herself is not justified.

Since the ALJ's findings regarding the four functional areas are all justified, the ALJ's conclusion that Flores's major depressive disorder is non-severe for Social Security purposes is also justified. I note that it appears that Flores does indeed suffer from depression and that depression plays a significant role in her life, but that the ALJ has nonetheless validly found that her symptoms do not align with a finding that her condition is "severe" for Social Security purposes. Since the ALJ's conclusion is reasonable and finds substantial support in the evidence, I shall not overturn the ALJ's determination regarding Flores's issues with depression.

I turn next to Listing 1.02. The ALJ's determination that Flores did not meet Listing 1.02 is inadequately justified. The ALJ does not provide a single citation to the record in evaluating 1.02 and only one sentence of analysis, noting only that "the involvement of a major peripheral joint did not result[] in an inability to perform fine and gross motor movements effectively or an

inability to ambulate effectively." Tr. 25. Nonetheless, the ALJ's error could be harmless if the ALJ is ultimately correct that Flores has not met Listing 1.02 because there is no evidence in the record that would throw such a conclusion into doubt. *See, e.g., Rodriguez Pagan* at 3. On the other hand, I will remand for further proceedings if such evidence exists.

In order to meet Listing 1.02, Flores must satisfy either 1.02(A) or 1.02(B). Assuming temporarily that Flores does in fact have major dysfunction of a joint or joints with gross anatomical deformity as well as chronic joint pain and stiffness with abnormal motion and imaging of joint space narrowing, bony destruction, or ankylosis (the preliminary criteria for meeting the listing), I will first consider 1.02(B). Flores does not appear to allege that the involvement of one of her major peripheral joints in each of her upper extremities has led to her being unable to perform fine and gross movements effectively as defined in 1.00(B)(2)(c). This standard would require her to be seriously limited in her ability to independently initiate, sustain, and complete activities due to extreme loss of function in her upper extremities; examples include her ability to do things like prepare simple meals, take care of her personal hygiene, sort and handle papers and files, and place files in a file cabinet at or above her waist level; Flores does not identify any evidence indicating that she is incapable of such things due to problems with the use of her upper extremities, even though she does allege limitations affecting her upper extremities and somewhat similar limitations due to issues with her lower extremities and other body parts.  As a result, Flores does not meet 1.02(B), which requires her to be unable to perform fine and gross motor movements effectively with her upper extremities under the 1.00(B)(2)(b) standard.

I next turn to 1.02(A). This portion of the listing requires an "inability to ambulate effectively" as defined in 1.00(B)(2)(b). The Commissioner suggests that in order to meet this definition, Flores would have to make use of an assistive device in order to help her walk, but this

is not the case: Flores simply must not be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living (even without the use of an assistive device). While I reach no finding as to whether or not Flores is able to ambulate effectively, I note that there is plenty of evidence in the record that tends to show that Flores's ability to ambulate is at least limited, even if the evidence is largely subjective. *See, e.g.*, Tr. 59-64, Tr. 447, Tr. 468, Tr. 772. However, the record does not appear to reflect that a "major peripheral weight-bearing joint" is involved in these limitations, as also required by 1.02(A); instead, Flores's ambulatory limitations appear to be due to spinal and perhaps pelvic issues rather than due to a peripheral weight-bearing joint. As a result, Flores does not meet 1.02(A) either and therefore cannot satisfy Listing 1.02 despite the ALJ's failure to adequately justify his determination regarding the listing.

Flores also challenges the ALJ's determination regarding Listing 1.04. Again, I find that the ALJ's determination that Flores did not meet Listing 1.04 is inadequately justified. In considering 1.04, the ALJ does not provide a single citation to the record and only two short sentences of analysis, noting that "the record does not show any evidence of muscle loss, muscle atrophy or weakness, or sensory or reflex loss" and that Flores "retains the ability to ambulate effectively and perform fine and gross motor movements." Tr. 26. However, I must also evaluate whether or not the ALJ's error in inadequately justifying the 1.04 determination is harmless.

In order to meet Listing 1.04, Flores must satisfy 1.04(A), 1.04(B), or 1.04(C). Assuming for the moment that Flores meets the preliminary requirements for 1.04, or some sort of spinal disorder such as spinal stenosis resulting in compromise of a nerve root or the spinal cord, I shall first turn to 1.04(C). As a preliminary matter, though, I note that Flores has explicitly

acknowledged that the record does not support a finding that Flores meets 1.04(B), and indeed, there is no indication in the record that Flores might meet 1.04(B).

1.04(C) requires that Flores have lumbar stenosis resulting in pseudoclaudication as established by medical imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. The ALJ states that Flores is able to ambulate effectively. As I note above, however, although I reach no ultimate conclusion on the issue, I am unconvinced that Flores is clearly able to ambulate effectively under the definition given in 1.00(B)(2)(b). Even if I were to look beyond the ALJ's analysis of 1.04 and also consider the portion of the ALJ's opinion where he considers Flores's RFC, the ALJ never reaches any clear conclusions regarding Flores's capacity to walk for extended periods of time. Although the ALJ does mention findings regarding Flores's gait and other factors that affect her ability to ambulate when determining her RFC, he does not provide any extended analysis of these factors or explain how he reached the conclusion that she is able to ambulate effectively as per 1.00(B)(2)(b). Again, the Commissioner's only argument in support of the ALJ's determination on this point is that Flores does not use an assistive device to walk, but the actual requirement under 1.00(B)(2)(b) is that Flores must not be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. As noted above, the record is not as clear regarding Flores's ability to do so as the ALJ suggests.

The ALJ also claims that the record does not show any evidence of muscle weakness, but in fact there is evidence of muscle weakness scattered throughout the record. *See, e.g.*, Tr. 65-66, Tr. 413, Tr. 452, Tr. 1063. Although it may be possible to determine that the evidence is somehow unreliable or outweighed by contrary evidence, and although most or all of the evidence is subjective rather than the result of medical findings, to claim that such evidence does not exist is

clearly incorrect. There is also extensive evidence of pain suffered by Flores within the record, which the ALJ does not deny. Flores therefore may be able to meet the 1.04(C) requirements.

Turning back to the preliminary requirements for Listing 1.04, it is clear that Flores has suffered from forms of spinal stenosis; in fact, she had multiple surgeries related to stenosis. Her surgeries make it possible that one could reasonably find that her spinal cord has been compromised as well. Accordingly, I find that Flores may be able to meet the preliminary requirements for Listing 1.04 and that remand on the issue is necessary. I note that although the ALJ may ignore 1.04(B) on remand since Flores has acknowledged that she does not meet that portion of the listing, he should either reevaluate or clarify his findings regarding 1.04(A) as well, though I note that the record does not appear to reflect that Flores suffers from muscle atrophy, which in turn appears to be a requirement of 1.04(A) (though I reach no conclusion on this issue).

In closing, Flores also challenges the ALJ's RFC determination. Since the ALJ has potentially given short shrift to certain evidence regarding Flores's ability to ambulate effectively and evidence regarding muscle weakness, upon remand, the ALJ should make an explicit finding regarding whether or not it will be necessary to reevaluate Flores's RFC. However, I note that despite Flores's implications otherwise, the ALJ is not actually required to give full credit to any medical professional in reaching a determination regarding Flores's RFC. Moreover, the ALJ's explanations for why he chose to not give full credit to any single medical professional in the present matter are reasonable.

For instance, at first glance the ALJ's analysis of Dr. Ballester's opinion seems to be inadequate, as it does not discuss how Dr. Ballester arrived at his conclusions. However, the Commissioner notes correctly that Dr. Ballester does not actually cite any clinical evidence or findings in the legible portion of his opinion. The ALJ's statement that Dr. Ballester did not provide

a substantive evaluation of Flores's condition is therefore satisfactory. Furthermore, Flores does not explain why Dr. Ballester's opinion merits additional weight, merely stating in conclusory fashion that it does.

The Commissioner also correctly notes that Dr. Vargas does not provide any support for his opinion that Flores is disabled beyond vague citations to Flores's past surgeries and that his opinion is somewhat internally inconsistent, since Dr. Vargas notes at one point that Flores can perform unlimited fingering and feeling but notes elsewhere that she can only perform fingering and feeling occasionally. It would also be reasonable to find that Dr. Vargas's opinion is not fully consistent with the record as a whole since, for instance (and as the Commissioner notes), there are other findings that suggest that Flores would suffer few to no limitations in her ability to push, pull, finger, or handle. However, the ALJ should reevaluate or explain the claim that "nothing" in the medical record would support the idea that Flores sometimes needs to alternate between sitting and standing, since at a minimum Flores's testimony at the hearing before the ALJ would suggest that she does sometimes possess the need to alternate between sitting and standing.

The ALJ's finding that the government consultants' opinions did not deserve full credit actually favored Flores, since they found that Flores's RFC should be less restrictive than the ALJ's ultimate finding. *Cf., e.g.*, *Davis B. v. Berryhill*, 2019 WL 495580, at *3 (D. Me., 2019) (explaining in regards to certain listings that any error made that favors a claimant is harmless). Moreover, the ALJ reasonably found that their opinions were not fully consistent with the record as a whole, since (among other things) as the Commissioner notes, the consultants apparently would not have had the opportunity to fully review all the relevant medical evidence related to Flores's surgeries since one of them took place only shortly before the second consultant opinion was released. As a result, the logic behind the ALJ's RFC determination is essentially reasonable, but the ALJ should

revisit Flores's RFC after reevaluating Listing 1.04 and should also explain his statement that nothing in the medical record indicates that Flores does not need to alternate between sitting and standing upon remand.

The ALJ has a difficult and sometimes unenviable job, and Flores's implications that the ALJ is somehow biased against her or willfully misinterpreting the record are not persuasive or well-founded. Nonetheless, remand is necessary here for the limited reasons noted above.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of March, 2022.

*s/Bruce J. McGiverin*

BRUCE J. McGIVERIN
United States Magistrate Judge